The Full Commission pursuant to its authority under Rule 801 and in the interest of justice hereby denies defendants' motion to dismiss plaintiff's appeal pursuant to Rule 701 and finds that plaintiff's notice of appeal was sufficient under the circumstances.
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes, the briefs and the arguments of the parties. The appealing party has shown good ground to reconsider the evidence. After careful review and consideration, the Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
***********
The Full Commission finds as facts and concludes as a matter of law the following, which were entered into by the parties prior to the hearing in a Pre-Trial Agreement which is incorporated herein by reference and at the hearing as
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff-employee and defendant-employer at all relevant times.
3. Plaintiff's average weekly wage is $211.61.
4. Plaintiff's rotator cuff tear occurred while she was performing her job with employer-defendant.
5. After the hearing before Deputy Commissioner Holmes, certain medical records were stipulated into evidence by the parties.
***********
Based upon all of the competent evidence of record, the Full Commission rejects the findings of fact found by the Deputy Commissioner and finds as follows
 FINDINGS OF FACT
1. Plaintiff, who was 42 years old at the time of hearing before Deputy Commissioner Holmes, graduated from high school and is licensed as a cosmetologist and a CNA. She began working for defendant-employer on October 27, 1997 approximately two months prior to her incident at work. Plaintiff worked as a calendar operator and her job duties included operating the calendar machine, making mix, sewing elastic bands together and putting elastic into calendar machines where a finish was applied to the elastic. The elastic emptied out of the calendar machines into boxes. Once the boxes were filled, plaintiff would close and tape the boxes and pull them across the floor to a scale where she would then weigh them. Occasionally, plaintiff would load the boxes onto buggies after they had been weighed; however, plaintiff did not understand that this was part of her job duties. She performed this task only when buggies were available and when time would permit.
2. Calendar operators usually worked in pairs. However, when one employee is on break, a co-worker must operate the machines alone. Plaintiff worked with Johnny Barfield who trained her to run the calendar machines. Plaintiff's training period lasted approximately a month or more during which times she operated one calendar machine due to the complexity of the job. As her proficiency increased, plaintiff began operating more than one machine. Due to a heavier workload, there were times when plaintiff and Mr. Barfield would operate two or three machines. However, they did not routinely operate three machines. In fact, three machines were in operation only two to three times a week. The number of hours per day would vary.
3. The weight of the boxes which were pushed across the floor and weighed by plaintiff varied from 10 to 50 pounds usually. However, plaintiff also occasionally pushed and lifted boxes which weighed over 60 pounds. The boxes became heavier if more elastic was produced by the calendar machine before the calendar operators could move and replace the filled boxes. In fact, when the calendar operators were very busy, such as when three machines were running, they packed down the elastic to allow the boxes to continue to be filled.
4. After weighing the boxes, the calendar operators might load them on a buggy if one was available. The buggies were between six inches and one foot off the ground. The boxes had two handles which allowed the calendar operators to use two hands when loading a box onto the buggy. Some of the boxes were new and some were old. The older boxes were not in good condition and might have tape on them causing the box bottom to be rough or ragged.
5. On January 8, 1998, the work load was heavy and plaintiff was very busy. In fact three calendar machines were running and she and Mr. Barfield were working them. It was difficult to keep up with the pace so boxes were packed tighter resulting in a heavier box weight. Plaintiff took her break leaving Mr. Barfield to work the three machines alone. Thereafter, Mr. Barfield took his break leaving plaintiff alone to run the three machines. This put them behind schedule in weighing the boxes which were placed behind the calendar machine. When they were able to weigh the boxes, plaintiff weighed a box which weighed 65 pounds. She then pulled it off of the scale and took it into the room where a buggy happened to be available with room for just one last box. Because it was the last box, plaintiff had to tilt it back and edge it up onto the buggy with her right hand while steadying the buggy with her left hand. The box, the bottom of which was ragged from old tape, snagged on the buggy and became stuck; therefore, she had to pull up on the box to get the box bottom off the buggy. This resulted in her having to twist and turn the box and shove it with her right hand while also holding the buggy in place with her left hand. As she lowered the box she felt a sharp pain in her right shoulder and chest.
6. Although prior to this incident plaintiff had previously run three calendar machines, weighed and lifted a 65 pound box, and placed boxes on buggies, the totality of events and circumstances which resulted in the sharp pain she felt in her shoulder on January 8, 1998 constitutes an unusual event or an interruption of her normal work routine. When certain elements of a situation are analyzed alone and out of context, each element may appear normal; however, when placed into the particular context with the cumulative impact of all the elements, a situation may become unusual and constitute an interruption of the normal work routine. The totality of the events on January 8, 1998 was unusual. Plaintiff was operating three calendar machines, moving a 65 pound box which had a tattered and rough bottom which became stuck requiring twisting and pushing while she was loading it one-handed into the last place on a buggy which need to be steadied. This situation and culmination of events is unusual regardless of the fact that the duty of lifting boxes of elastic onto a buggy apparently became part of plaintiff's normal work routine even though she did not believe that loading buggies was a part of her job.
7. Prior to January 8, 1998, plaintiff had no problems with her right shoulder or arm.
8. On January 9, 1998, plaintiff was seen for shoulder and back pain by Dr. Robert L. Dough who originally treated plaintiff and diagnosed a shoulder strain. He recommended medication and that she decrease her lifting. On January 16, 1998, Dr. Dough took plaintiff out of work until January 19, 1998 and recommended additional restrictions for her return to work and medication. Plaintiff returned to Dr. Dough complaining of pain on January 20, 1998 at which time he limited her to no use of the right arm at work or at home. Even with no use of her right arm plaintiff continued to have difficulties, therefore Dr. Dough removed plaintiff from work on January 22, 1999. Thereafter, plaintiff underwent physical therapy recommended by Dr. Dough.
9. On February 23, 1998, plaintiff was seen by Dr. Singh at the Asheboro Orthopaedic Clinic where she underwent x-rays and was diagnosed with impingement syndrome and a possible rotator cuff tear. An MRI of her shoulder was recommended and performed which confirmed a tear of the rotator cuff, degenerative tendonitis and deformity of the acromion indicating impingement syndrome. Plaintiff eventually underwent shoulder surgery on March 4, 1998 to repair her torn rotator cuff. After the surgery, plaintiff was treated with additional physical therapy and her shoulder improved slowly. She also received steroid injections which improved her shoulder condition. However, due to continued neck complaints, Dr. Singh referred plaintiff for evaluation at Johnson Neurological Clinic to rule out any possible disc herniation.
10. Plaintiff returned to work with defendant-employer sometime prior to October 5, 1998 for 3 to 4 days a week at less than 8 hours a day. On October 5, 1998, Dr. Singh recommended that plaintiff work 4 hours a day 5 days a week as opposed to more hours a day and fewer days per week. On November 19, 1999, the date of the hearing before Deputy Commissioner Holmes, plaintiff continued under the care of Dr. Singh who was treating her with therapy and medication. Additionally, at this time she was working for defendant-employer in the calendar room for 4 hours a day with restrictions of no lifting greater than 5 pounds with her right arm.
11. Plaintiff's average weekly wage is $211.61 yielding a weekly compensation rate of $139.66.
***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows
 CONCLUSIONS OF LAW
1. On January 8, 1998, plaintiff sustained an injury by accident arising out of and in the course of her employment resulting in a rotator cuff tear. N.C.G.S. § 97-2(6).
2. Plaintiff is entitled to temporary total disability benefits beginning January 16 to January 19, 1998 and from January 22, 1998 and continuing until the time that she returned to work with defendant employer sometime prior to October 5, 1998, subject to reasonable attorney's fees. Furthermore, subject to reasonable attorney's fees, plaintiff is entitled to temporary partial or permanent partial disability, which ever remedy is more munificent. N.C.G.S. § 97-29, § 97-30, § 97-31.
3. Plaintiff is entitled to payment by defendants of any reasonably necessary medical treatment, including but not limited to the surgery for her rotator cuff repair, which tends to effect a cure, provide relief or lessen the period of plaintiff's disability subject to the limits of N.C.G.S. § 97-25.1. N.C.G.S. § 97-25 and § 97-25.1.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of the Deputy Commissioner and enters the following
 AWARD
1. Subject to a reasonable attorney's fee awarded herein, defendants shall pay plaintiff benefits for temporary total disability beginning January 16 to January 19, 1998 and beginning January 22, 1998 and continuing until she returned to work for defendant-employer sometime prior to October 5, 1998. Furthermore, defendants shall pay plaintiff temporary partial disability in the event plaintiff returned to work at lesser wages or permanent partial disability which ever is the more munificent remedy, subject to a reasonable attorney's fee awarded herein. If the parties cannot agree to the amount or period of temporary total, temporary partial, or permanent partial disability owed, either party may request a hearing by filing a Form 33 with the Commission.
2. Defendants shall pay for any reasonably necessary medical treatment, including but not limited to the surgery for plaintiff's rotator cuff repair, which tends to effect a cure, provide relief or lessen the period of plaintiff's disability subject to the limits of N.C.G.S. § 97-25.1.
3. An attorney's fee in the amount of 25% is hereby awarded to plaintiff's counsel. This amount shall be deducted from all accrued amounts and made payable directly to plaintiff's counsel. Thereafter, payment of the attorney's fee shall be made by every fourth check paid directly to plaintiff's counsel.
4. Defendants shall pay the costs due this Commission.
S/_____________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/_____________ THOMAS J. BOLCH COMMISSIONER
S/_____________ RENEE C. RIGGSBEE COMMISSIONER
DCS: nwg